**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 4 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

THOMAS H. SCOTT and LYNN D.
SCOTT, Transferees,

    Petitioners - Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

    Respondent - Appellee.

No. 99-9018

APPEAL FROM THE UNITED STATES TAX COURT
(T.C. No. 5245-95)

Thomas G. Hodel of Doussard Hodel & Markman, P.C., Lakewood, Colorado, for
Petitioners-Appellants.

Joel McElvain, Attorney (Ann B. Durney, Attorney, with him on the brief), Tax
Division, Department of Justice, Washington, D.C., for Respondent-Appellee.

Before **LUCERO**, **McKAY**, and **MURPHY**, Circuit Judges.

**McKAY**, Circuit Judge.

The Tax Court determined that Petitioner-Appellant Thomas H. Scott,[1] who was a corporate executive of a now insolvent company, was liable as a transferee of assets for unpaid income taxes and the interest that accrued since the taxes became due. Appellant asserts that he cannot be a transferee within the meaning of 26 U.S.C. § 6901(a)(1)(A) because he did not directly receive any assets from the assessed company. The Tax Court rejected that argument. This appeal followed.

Appellant was a director and officer of Mountain States Stock Transfer Agents, Inc. (MSSTA), a corporation that conducted business as a securities transfer agent from 1980 until 1989. In 1989, Appellant set into motion a series of meetings that paved the way for the sale of substantially all of MSSTA's assets to the company's primary competitor, American Transfer, Inc. (AST). The tax consequences of that transaction forms the core of this dispute.

There is evidence on the record that AST was willing to pay $800,000 to acquire the assets of MSSTA. After investigating various ways to structure the deal and the different tax consequences, the transaction was finalized as follows. AST purchased the assets of MSSTA for $300,000. MSSTA entered a Stock Redemption Agreement with its primary stockholder, Mr. Carter, for that exact

_____

[1]Thomas H. and Lynn D. Scott were joint petitioners, but the appeal concerns only the liability of Thomas H. Scott.

amount. Additionally, AST entered a consulting and non-compete agreement with Mr. Carter entitling him to payments totaling $525,000 over the next four years. MSSTA retained a limited number of customer accounts to cover continuing overhead obligations, including estimated tax liabilities, and AST received an option to purchase those accounts at a set price by a specified date.

Although Appellant and his wife owned 48% of the acquired MSSTA stock, the formal agreements made no liquidating distributions to them, which payments from MSSTA would have been subject to a capital gains tax. Instead, Appellant negotiated a deal that resulted in he and his wife purchasing 21% of the stock interest in AST for the nominal price of ten cents per share, for a total expense of $1230. Their stock share increased to a 33% interest in AST when Appellant agreed to forgo contributions to a profit-sharing plan and agreed to guarantee a bank loan that AST required to finance the purchase.

Consequently, for the 1989 tax year MSSTA reported a sale of substantially all of its assets for $300,000, and Appellant reported no liquidating distributions from MSSTA. Appellant later redeemed the acquired AST stock and claimed a cost basis of $749,760, although the majority of the stock had been purchased for $1230. In 1991, the IRS audited MSSTA's 1989 tax filing. Appellant was a party to the audit's Closing Agreement. Appellant joined in stipulating that MSSTA actually realized $801,820 from the sale of assets to AST, which left an unpaid

tax liability of $164,981. Undercapitalized, MSSTA could not satisfy that liability. The agreement further stipulated that a portion of the stock shares Appellant and his wife received from AST actually represented consideration paid by AST for the purchase of MSSTA's assets. That amount was valued at $199,652.

Title 26 U.S.C. § 6901 authorizes the Internal Revenue Service to collect taxes from parties to whom assets were transferred. Accordingly, the Commissioner proceeded to collect the outstanding liability from Appellant. Although § 6901 provides a procedural mechanism whereby the IRS can assess transferee liability, it does not define substantive liability. Rather, we rely on applicable state law to determine whether a person is liable as a transferee of assets. See Comm'r v. Stern, 357 U.S. 39, 42 (1958). Appellant asserts that as a matter of law he cannot be considered a § 6901 transferee because he did not receive any assets directly from MSSTA. In advancing this argument, he relies primarily on the holding of Vendig v. Commissioner, 229 F.2d 93 (2d Cir. 1956).

It is undisputed that Appellant received stock shares directly from AST and that the transaction was structured so that he received no distributions from MSSTA. In Vendig, the Second Circuit held that a similarly situated shareholder was not a transferee within the meaning of the revenue code, holding that where "the vendee issues its stock directly to the shareholders, then that stock never

-4-

becomes a part of the vendor's assets, for these assets become the property of the vendee corporation when the vendor ceases to exist." 229 F.2d at 96. The court acknowledged that "this holding may allow the parties, under some circumstances, to vary the tax consequences according to the manner in which a reorganization is conducted, but this does not affect the amount of the tax or the availability of property to satisfy it." Id. at 96-97. In contrast, the structure of Appellant's transaction did affect the amount of tax owed, and analysis of that distinction leads us to a different conclusion than the one reached in Vendig.

A necessary basis for the Vendig holding was that the stock exchange was for stock shares of equal value and that the exchange was pursuant to an agreement that was independent of the sale of company assets. See id. at 94-95. Conversely, Appellant's stock exchange was not extraneous but contingent on the sale of company assets. In fact, his stock exchange constituted a portion of the total consideration paid for those assets, thus affecting the tax consequences. Additionally, the stocks Appellant acquired were not purchased by reference to the stock-value of his MSSTA shares, but were instead purchased for a nominal price of ten cents per share. This arrangement leaves room for doubt as to whether Appellant acquired an interest of equal value. These facts distinguish this case from Vendig.

Reviewing a different type of transaction structure, the Vendig court was

comfortable that the shareholder did not "receive, directly or indirectly, property belonging to [vendor company]." Id. at 94. Here, in light of the stipulated agreement wherein Appellant agrees that he received property a portion of which represented partial consideration paid to MSSTA, we must reach the opposite conclusion. We hold that Appellant received assets, although indirectly, from the company that was later assessed with a tax liability. Appellant persists that in this unique area of tax law, some case law suggests viability for the old rule of form over substance. We reject that argument by reference to the thorough explanation given by the tax court wherein the court distinguished the cases upon which Appellant relies. See Scott v. Comm'r, 76 T.C.M. (CCH) 940 (1998), 1998 WL 838366 at *12-14.

The IRS's authorization to collect taxes under § 6901(a)(1)(A) extends to the income tax "liability, at law or in equity, of a transferee of property." The statute expressly includes a "distributee" of assets as a contemplated transferee. See § 6901(h). The regulations clarify that the term distributee includes "the shareholder of a dissolved corporation." Treas. Reg. § 301.6901-1(b). Appellant's stipulation that he, a shareholder, received a portion of the consideration paid for the purchase of MSSTA assets places him squarely within the broad parameters of § 6901. We turn to the applicable state law to define his substantive liability. See Stansbury v. Comm'r, 102 F.3d 1088, 1092 (10th Cir.

-6-

1996).

Colorado law includes at least three possible sources for transferee liability: a liquidation statute, a redemption statute, and a fraudulent conveyance statute. See Appellant's App. at 43. In our analysis we will track the decision of the tax court and analyze first Appellant's liability under the fraudulent conveyance statute. If that statue proves Appellant liable, there is no need to analyze the additional statutes. Under Colorado law, a conveyance is fraudulent when it is "made with the intent to hinder, delay, or defraud creditors," in this case the Internal Revenue Service. Colo. Rev. Stat. § 38-10-117(1). Fraudulent intent is question of fact. See Colo. Rev. Stat. § 38-10-120. The Tax Court concluded that the stock transfer was made "to Mr. Scott, the transferee, with the intent to hinder, delay, or defraud the Service within the meaning of the Colorado fraudulent conveyance statute." Scott, 76 T.C.M. (CCH) 940, 1998 WL 838366 at *18.

Appellant asserts that he had no intent to defraud because he did not know that an additional tax liability might incur. While structuring the deal, Appellant obtained multiple opinions on foreseeable tax consequences. Having reviewed the record, we conclude that the evidence is sufficient to support the Tax Court's finding that, informed by those opinions and by his own corporate acumen, Appellant knowingly chose to take a calculated risk. See id. at *16-18. The Tax

Court specifically found Appellant's testimony not credible when he claimed to not know that a tax liability might incur. See id. at *17.

Under Colorado law, because "[o]nly rarely will a creditor be able to produce direct proof of a debtor's intent," a "trier of fact may then draw the appropriate inference from the pattern of facts and circumstances presented." Yetter Well Serv., Inc. v. Cimarron Oil Co., 841 P.2d 1068, 1070 (Colo. Ct. App. 1992). Having reviewed the Tax Court's Memorandum Findings of Fact and Opinion, we conclude that the court's inferences and findings are not clearly erroneous.

Having determined that Appellant is liable under Colorado's fraudulent conveyance statute, the final issue is whether Appellant is liable to Respondent under the statutory interest provision. See Colo. Rev. Stat. § 5-12-102. In pertinent part, the provision states that a creditor shall receive interest on an outstanding debt "[w]hen money or property has been wrongfully withheld." § 5-12-102(1)(a). The interest provision does not define the operative term, wrongfully withheld, but Colorado courts construe that section broadly, stating that the section "is to discourage a person responsible for payment of a claim to stall and delay payment until judgment or settlement." See Mesa Sand & Gravel Co. v. Landfill, Inc., 776 P.2d 362, 364 (Colo. 1989) (en banc). The Tenth Circuit has held that under Colorado law "a 'wrongful withholding' need not

involve actual fraud, or indeed be tortious in nature." Stansbury, 102 F.3d at 1093. Under those broad parameters, we do not find clear error in the Tax Court's determination that Appellant wrongfully withheld the delinquent taxes.

We AFFIRM.